320 P.2d 650

J. B. and R. E. WALKER, Inc. and Columbia Casualty Co., Plaintiffs,

v.

INDUSTRIAL COMMISSION of Utah, Terralline Dukes and John Robert Dukes, Jr., Defendants.

No. 8751.

Supreme Court of Utah.

Jan. 23, 1958.

Moreton, Christensen & Christensen, Salt Lake City, for plaintiffs.

E. R. Callister, Atty. Gen., W. R. Inge-bretsen, Salt Lake City, for defendants.

WORTHEN, Justice.

Certiorari to the Industrial Commission of Utah to review an order granting death benefits under the Utah Compensation Act, U.C.A.1953, 35–1–1 et seq.

The facts are substantially without dispute.

John Robert Dukes, the deceased, was employed by J. B. and R. E. Walker, Inc., a Utah corporation, engaged in the sand and gravel business. Deceased began working in January, 1957. When employed he had no particular knowledge of machinery. His general duties were clean-up work around the plant. He was also helper to the plant operator and the evidence shows that his duties included operating the scales, lubricating various equipment, helping to repair conveyer belts and on one occasion, prior to the accident, he had operated the Hough loader which he was operating at the time of the accident.

The machine designated as a Hough loader was mounted on four wheels with a scoop on front used to lift sand or gravel into a truck.

Although its general operation was somewhat similar to an automobile, testimony disclosed it had some important differences as follows: (1) The wheels had short centers and would react quicker and turn in tighter circles. (2) Depression of the brake pedal disengaged the driving gears about the same as depression of the clutch pedal of a passenger automobile. (3) The machine was top heavy and could be tipped over easily. The machine was used for loading trucks in three different plant areas, each at a different elevation, which made it necessary to move the loader up from a lower to a higher level or bring it down from an upper to a lower level.

On May 11, 1957, John Robert Dukes was fatally injured while bringing the loader from a higher to a lower level. Plaintiffs in this action contend that the accident did not arise out of or during the course of his employment because deceased disobeyed instructions given him by the plant operator.

■ The Commission, having made an award, we must affirm the same if there is substantial evidence to support its findings.[1]

On an occasion previous to May 11, 1957, the deceased had, at the request of Mr. Reed, the plant operator, taken the Hough loader from a lower level to a higher level. There is testimony that the deceased wanted to take the machine back down the hill the same day he had taken

1. Kent v. Industrial Commission, 89 Utah 381, 57 P.2d 724.

it up, but Mr. Reed told him no, "that it was too dangerous. He didn't know enough about it."

Mr. Reed testified:

"Q. Did you tell him anything about getting into it or attempting to operate it? A. I told him that until he learned about it not to get on it."

Mr. Reed further testified:

"Q. Is there any difference in driving it up and driving it down? A. Decidedly, I'd say.

"Q. Will you explain the difference? A. Well, in driving it uphill, this unit has a fluid drive unit in it, and if you try to drive it uphill in the higher speed gears it would just sit there. It wouldn't move, * * * so you have to drive it in the lower gear, and in the lower gear it will only go about three miles an hour, and it will practically go straight up if it has to.

"Q. You mean practically vertically? A. Yes * * * if you keep your throttle down you can go up any hill. In going downhill, if you stayed *in that low gear* you'd have the same effect. If you went downhill you would only go about three miles an hour, and you wouldn't go any faster as long as you kept the gas down. Its only in the other speeds that you

lose that compression." (Emphasis added.)

Mr. Reed further testified:

"Q. You indicated that you had a conversation with Johnny concerning the operation of this Hough, and told him that eventually he would learn about it; is that correct? A. That's right.

"Q. And that your normal course of procedure when new employees come to work for the company is that eventually they learn more or less all about all of the equipment? A. The turnover in employment up there is such that if a man is interested enough to stay on there he can, if he's willing to wait, practically assure himself of any of the jobs out there."

Mr. Reed testified that Jim Batt was qualified to operate the Hough loader.

On Saturday, May 11, 1957, it had rained and prevented full scale operations at the plant. The crusher didn't operate and there were on the job only sufficient personnel to provide service to customers who came in. The job of scale man was assigned to deceased. Mr. Reed testified that when the accident occurred he had gone up on the crusher level to instruct some welders on some work they were doing. Before leaving the lower level he left Jim Batt in charge and told Batt if he

needed any help to have Johnny come over and help him, "and when I left Jim I also went over and told Johnny to help him if he came over and asked him to." Reed testified that he did not say anything to Johnny on that day about operating the Hough loader.

Reed testified as follows:

"Q. Did Mr. Batt have any control over Mr. Dukes? A. Mr. Dukes worked directly under Mr. Batt. * *"

Jim Batt testified that the "people that brought the machine up there, they assumed that a man could be able to run it within a few minutes."

"Q. You are talking about the Hough loader? A. Yes. Johnny knew that, * * *."

Mr. Batt further testified as follows:

"Q. Have you ever received any instruction on how to operate this Hough loader? A. With Chick, when * * * The first day I was on it he was with me for a few minutes and, I don't remember what it was, but I did ask him about something on the operation of it."

Mr Christensen:

"Q. When you say 'Chick,' you mean Mr. Reed? A. Mr. Reed, yes.

"Q. You drive both uphill and downhill? A. Yes.

"Q. Do you say it probably took you a few minutes to learn how to do that? A. Yes."

Jim Batt stated that Curley drove his truck in and then he testified as follows:

"A. Well, we were working there, and we had to have equipment or parts from up above to repair the belt, but we weren't going up right then to get them, but he said something about *should he go get the loader*, and *I told him I didn't know*, and then in a few minutes he said he was going to go get it and bring it down for Curley to load the truck.

"Q. Did you tell him to do so? A. No, I didn't. * * *

"Q. When Mr. Dukes left the area in which you were working to go get the loader, did he take a truck or go by foot? A. He went on foot.

"Q. Now what did you then do, if anything? A. Well, before he left I asked him if he had run the loader, and he said yes he had, and he took off and went on up the hill, and I was there a few minutes, and it couldn't have been more than three minutes and I got in the pickup and went up around where the loader was and he was just getting there then.

136

"Q. What was your reason for going up there? A. I don't know really.

"Q. Were you concerned about his ability to operate it? A. I guess that is what it was. That is what it was, because I asked him again if he had run it, and he said hell yes he had run it, and climbed on it." (Emphasis added.)

The record does not disclose that Mr. Reed ever told the deceased not to get on the loader, except on the one occasion, nor is it disclosed how long before the fatal accident deceased took the Hough loader up the hill to Mr. Reed.

However, on May 11, 1957, Mr. Reed placed James Batt in charge of the plant area involved and told him to call on deceased if he needed his help and likewise told deceased to help Mr. Batt if he asked him to. Reed did not tell Batt not to let Dukes operate the loader, nor did he say anything to Dukes on that day "about operating the Hough loader."

On May 11th the deceased worked directly under Mr. Batt. It is also significant that when Reed asked Dukes to bring the loader up the hill that Reed knew Johnny had never been in the machine before.

It cannot be said that the deceased on the date in question in undertaking to bring down the loader departed from the specific work he was expected to do. He was undertaking to help Mr. Batt to get the loader to load Curley's truck.

There is no evidence that Dukes had not received instruction in the operation of the loader; nor is there any evidence that he had not observed its operation. He did not violate any instruction from the man immediately over him; Batt did not order him not to get the loader. Batt asked deceased only if he had run the loader and deceased answered that he had. There was no posted notice ordering deceased or any other employees not to operate the loader.

Deceased certainly did not depart from his employment; what he did was one part of the duties that were expected of him on May 11th. In the absence of a specific order from Batt not to get the loader, and of an order from Reed before he left the area not to operate the loader we must hold that deceased did not depart from his employment and that the accident arose out of and during the course of his employment.

Order affirmed. No costs allowed.

McDONOUGH, C. J., and CROCKETT, WADE, and HENRIOD, JJ., concur.